IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA


JO ANN TAYLOR-WOOD,          )
                                            )
               Plaintiff,        )
                                            )
                v.           )       1:10CV237
                                            )
MICHAEL J. ASTRUE,            )
Commissioner of Social Security,     )
                                          )
              Defendant.    )


MEMORANDUM OPINION AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE

Plaintiff, Jo Ann Taylor-Wood, brought this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act (the "Act"), as amended (42 U.S.C. §§ 405(g) and 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying her claims for Disability Insurance Benefits and Supplemental Security Income under, respectively, Titles II and XVI of the Act. The parties have filed cross-motions for judgment, and the administrative record has been certified to the Court for review.

I.    PROCEDURAL HISTORY

Plaintiff filed her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") on September 14, 2007 (with a protective filing date of August 28, 2007), alleging a disability onset date of July 21, 2006. (Tr. 4, 118-25.)[1] Her

---

[1] Transcript citations refer to the Administrative Transcript of Record filed manually with the Commissioner's Answer [Doc. #11].

applications were denied initially (Tr. at 70-71, 83-91) and upon reconsideration (Tr. at 72-73, 83-91). Thereafter, Plaintiff requested a hearing de novo before an Administrative Law Judge ("ALJ"). (Tr. at 92-94.) Plaintiff, along with her attorney and a vocational expert ("VE"), attended the subsequent hearing on March 16, 2009. (Tr. at 4, 13.) The ALJ ultimately determined that Plaintiff was not disabled within the meaning of the Act (Tr. at 12) and the Appeals Council subsequently denied Plaintiff's request for review of the decision, thereby making the ALJ's conclusion the Commissioner's final decision for purposes of judicial review.[2]

In rendering his disability determination, the ALJ made the following findings later adopted by the Commissioner:

> 1. The claimant met the insured status requirements of the Social Security Act through June 30, 2008.
>
> 2. The claimant has not engaged in substantial gainful activity since July 21, 2006, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).
>
> 3. The claimant has the following severe impairments: fibromyalgia, osteoarthritis and hypertension (20 CFR 404.1521 *et seq.* and 416.921 *et seq.*).
> . . . .
>
> 4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1525, 404.1526, 416.925 and 416.926).
> . . . .
>
> 5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to lift and carry up to 10 pounds

---

[2] Defendant notes in her brief that "the Appeals Council's denial of review was not included in the certified administrative record, apparently due to clerical oversight." (Def.'s Br. [Doc. #18] at 2.) However, neither party moves for remand pursuant to sentence six of 42 U.S.C. § 405(g) simply to include this Notice in the record, and the Court declines to order such a remand *sua sponte*. Moreover, the Court notes that the Notice is included in the record in any event in a Supplemental Certification dated October 18, 2010. Therefore, the Court need not consider this issue further.

occasionally; to stand and walk for up to six hours in an eight-hour work day; and to sit for up to six hours in an eight-hour work day. The claimant would be further restricted from jobs requiring constant use of hands, overhead reaching or frequent postural activities.

(Tr. at 6-7.)

The ALJ then considered Plaintiff's age, education, work experience, and the above residual functional capacity ("RFC"), along with the VE's testimony regarding these factors, and determined that Plaintiff was able to perform her past relevant work. She therefore was not under a "disability," as defined in the Act, from her alleged onset date through the date of the decision. (Tr. at 12.)

## II. LEGAL STANDARD

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, the scope of review of such a decision is "extremely limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981). "The courts are not to try the case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead, "a reviewing court must uphold the factual findings of the ALJ if they are supported by substantial evidence and were reached through application of the correct legal standard." Hancock v. Astrue, 667 F.3d 470, 472 (4th Cir. 2012) (internal quotation omitted).

"Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1993) (quoting Richardson v. Perales, 402 U.S. 389, 390 (1971)). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270

F.3d 171, 176 (4th Cir. 2001) (internal citations and quotation marks omitted). "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the court should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ]." Mastro, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the ALJ." Hancock, 667 F.3d at 472. "The issue before [the reviewing court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

In undertaking this limited review, the Court notes that "[a] claimant for disability benefits bears the burden of proving a disability." Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). In this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'" Id. (quoting 42 U.S.C. § 423(d)(1)(A)).[3]

---

[3] "The Social Security Act comprises two disability benefits programs. The Social Security Disability Insurance Program (SSDI), established by Title II of the Act as amended, 42 U.S.C. § 401 et seq., provides benefits to disabled persons who have contributed to the program while employed. The Supplemental Security Income Program (SSI), established by Title XVI of the Act as amended, 42 U.S.C. § 1381 et seq., provides benefits to indigent disabled persons. The statutory definitions and the regulations promulgated by the Secretary for determining disability, see 20 C.F.R. pt. 404 (SSDI); 20 C.F.R. pt. 416 (SSI), governing these two programs are, in all aspects relevant here, substantively identical. " Craig, 76 F.3d at 589 n.1.

"The Commissioner uses a five-step process to evaluate disability claims." Hancock, 667 F.3d at 472 (citing 20 C.F.R. §§ 404.1520(a)(4); 416.920(a)(4)). "Under this process, the Commissioner asks, in sequence, whether the claimant: (1) worked during the alleged period of disability; (2) had a severe impairment; (3) had an impairment that met or equaled the requirements of a listed impairment; (4) could return to her past relevant work; and (5) if not, could perform any other work in the national economy." Id.

A finding adverse to the claimant at any of several points in this five-step sequence forecloses a disability designation and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at the first two steps, and if the claimant's impairment meets or equals a "listed impairment" at step three, "the claimant is disabled." Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment," then "the ALJ must assess the claimant's residual functional capacity ('RFC')." Id. at 179.[4] Step four then requires the ALJ to assess whether, based on that RFC, the

---

[4] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (e.g., pain)." Hines, 453 F.3d at 562-63.

claimant can "perform past relevant work"; if so, the claimant does not qualify as disabled. Id. at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, which "requires the [Government] to prove that a significant number of jobs exist which the claimant could perform, despite the claimant's impairments." Hines, 453 F.3d at 563. In making this determination, the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the Government cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.[5]

III.    DISCUSSION

In the present case, the ALJ found that Plaintiff had not engaged in "substantial gainful activity" since her alleged onset date. She therefore met her burden at step one of the sequential evaluation process. At step two, the ALJ further determined that Plaintiff suffered from the following severe impairments: fibromyalgia, osteoarthritis, and hypertension. (Tr. at 6.) The ALJ found at step three that these impairments did not meet or equal a disability listing. Accordingly, he assessed Plaintiff's RFC and determined that Plaintiff could lift and carry up to 10 pounds occasionally, stand and walk for up to six hours in an eight-hour work day, and sit for up to six hours in an eight-hour work day. However, he found Plaintiff incapable of

---

[5]  A claimant thus can qualify as disabled via two paths through the five-step sequential evaluation process. The first path requires resolution of the questions at steps one, two, and three in the claimant's favor, whereas, on the second path, the claimant must prevail at steps one, two, four, and five.

performing jobs requiring constant use of hands, overhead reaching, or frequent postural activities. (Tr. at 7.) Because Plaintiff's past relevant work as a collections clerk "does not require the performance of work-related activities precluded by" her RFC, the ALJ ultimately determined that Plaintiff could return to her past relevant work under step four of the analysis and was therefore not disabled. (Tr. at 12.)

Plaintiff argues that the ALJ erred in three respects: (1) he failed to properly assess her credibility in accordance with <u>Craig v. Chater</u>; (2) he improperly accorded little weight to the opinion of Dr. Franc A. Barada; and (3) he failed to include significant limitations in Plaintiff's RFC.[6] Defendant contends otherwise and urges that substantial evidence supports the determination that Plaintiff was not disabled. (Def.'s Br. at 18.)

A.      Credibility

Plaintiff first argues that the ALJ failed to properly assess her pain allegations under the framework set out in <u>Craig</u>, 76 F.3d at 594-95. <u>Craig</u> provides a two-part test for evaluating a claimant's statements about symptoms. "First, there must be objective medical evidence showing 'the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged.'" <u>Id.</u> at 594 (citing 20 C.F.R. §§ 416.929(b) & 404.1529(b)). If the ALJ determines that such an impairment exists, the second part of the test then requires him to consider all available evidence, including Plaintiff's statements about her pain, in order to

_____

[6] Plaintiff's brief presents credibility as the third and final issue. However, because the ALJ's credibility determination impacted his treatment of both Dr. Barada's opinion and the RFC assessment, the Court addresses credibility first.

evaluate "the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work." Craig, 76 F.3d at 596.

Notably, while the ALJ must consider Plaintiff's statements and other subjective evidence at step two, he need not credit them "to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers." Id. This approach facilitates the ALJ's ultimate goal, which is to accurately determine the extent to which Plaintiff's pain or other symptoms limit her ability to perform basic work activities. Thus, a plaintiff's "symptoms, including pain, will be determined to diminish [her] capacity for basic work activities [only] to the extent that [her] alleged functional limitations and restrictions due to symptoms, such as pain, can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. § 404.1529(c)(4). Relevant evidence for this inquiry includes Plaintiff's "medical history, medical signs, and laboratory findings" Craig, 76 F.3d at 595, as well as the following factors set out in 20 C.F.R. § 404.1529(c)(3):

(i) [Plaintiff's] daily activities;

(ii) The location, duration, frequency, and intensity of [Plaintiff's] pain or other symptoms;

(iii) Precipitating and aggravating factors;

(iv) The type, dosage, effectiveness, and side effects of any medication [Plaintiff] take[s] or [has] taken to alleviate [her] pain or other symptoms;

(v) Treatment, other than medication, [Plaintiff] receive[s] or [has] received for relief of [her] pain or other symptoms;

(vi) Any measures [Plaintiff] use[s] or [has] used to relieve [her] pain or other symptoms (e.g., lying flat on [her] back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and

(vii) Other factors concerning [Plaintiff's] functional limitations and restrictions due to pain or other symptoms.

Where the ALJ has considered these factors and has heard Plaintiff's testimony and observed her demeanor, the ALJ's credibility determination is entitled to deference. See Shively v. Heckler, 739 F.2d 987, 989 (7th Cir. 1984). Accordingly, the Court "will reverse an ALJ's credibility determination only if the [plaintiff] can show it was 'patently wrong.'" Powers v. Apfel, 207 F.3d 431, 435 (7th Cir. 2000).

In the present case, Plaintiff alleged pain as a result of her documented fibromyalgia and osteoarthritis, and the ALJ determined at step one of the Craig analysis that these conditions "could reasonably be expected to produce [her] alleged symptoms." (Tr. at 8.) However, the ALJ found at step two that substantial evidence failed to support the intensity and persistence of the pain alleged by Plaintiff or the extent to which her pain limited her ability to work. Therefore, the ALJ ultimately concluded that Plaintiff's pain, although severe, was not disabling.

Plaintiff contends that the ALJ's rejection of her pain testimony was inconsistent with his finding at step one. She mistakenly implies that, in finding that a claimant "passes" step one of Craig, an ALJ must also fully accept the claimant's pain allegations, including the amount and degree of pain alleged. This interpretation of Craig has been rejected by all of the District Courts in North Carolina and finds no support in circuit court cases post-dating that decision. See Cobb v. Astrue, No. 1:07CV253, 2009 WL 3206731, at *6-7 (M.D.N.C. Sept. 30, 2009); Smith v. Astrue, No. 3:09CV488, 2011 WL 1303637, at *4-7 (W.D.N.C. Mar. 31, 2011); Felton-

Miller v. Astrue, No. 2:10-CV-5-FL, 2010 WL 4809028, at *6-8 (E.D.N.C. Nov. 17, 2010), aff'd, 459 F. App'x 226 (4th Cir. 2011).  In fact, Plaintiff's challenge is nothing more than a restatement of the contention put forward by Craig herself, who unsuccessfully argued that "the ALJ was obliged to accept, without more, her subjective assertions of disabling pain and her subjective assessment of the degree of that pain." Craig, 76 F.3d at 591.  As the Fourth Circuit held, "that is not and has never been the law in this circuit."  Id.

Instead, step one requires Plaintiff to make a "threshold . . . showing by objective medical evidence of the existence of a medical impairment 'which could reasonably be expected to produce' the actual pain, in the amount and degree, alleged by the claimant."  Craig, 76 F.3d at 594 (quoting 20 C.F.R. §§ 404.1529 and 416.929).  As further explained in Craig,

> [t]his threshold test does not, as the regulation is careful to emphasize, entail a determination of the "intensity, persistence, or functionally limiting effects" of the claimant's asserted pain.  See 20 C.F.R. §§ 416.929(b) & 404.1529(b).  At this stage of the inquiry, the pain claimed is not directly at issue; the focus is instead on establishing a determinable underlying impairment—a statutory requirement for entitlement to benefits, see 42 U.S.C. § 1382c(a)(3)(A)—which could reasonably be expected to be the cause of the disabling pain asserted by the claimant.
> . . . .
>
> It is only after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated.  See 20 C.F.R. §§ 416.929(c)(1) & 404.1529(c)(1).

Craig, 76 F.3d at 595.  In other words, Plaintiff must show evidence of an impairment *capable* of producing pain in the amount and degree she alleges to pass step one of the Craig analysis.  Whether her impairment actually produces that amount and degree of pain, along with the effect

of that pain on the Plaintiff's ability to work, falls under step two. See 20 C.F.R. §§ 404.1529(c)(4) and 416.929(c)(4). Thus, in <u>Craig</u>, the Fourth Circuit concluded that the ALJ should consider at step one whether the claimant "has an objectively identifiable medical impairment that could reasonably cause the pain of which she complains." If the claimant makes this showing at step one, the claimant's assertions of pains are still not automatically accepted, and instead the ALJ should then "undertake an assessment in the credibility of [the claimant's] subjective claims of pain." <u>Id.</u>

In the present case, the ALJ determined that Plaintiff's osteoarthritis and fibromyalgia were both severe impairments during the period at issue in that they caused significant limitations in her ability to perform basic work activities. With respect to step one of the Craig analysis, he also found that Plaintiff had a medically determinable impairment "that could reasonably be expected to produce the pain and other symptoms alleged." However, he further found that the degree of pain and limitation alleged by Plaintiff was inconsistent with the objective medical evidence and other evidence, including the factors set out in 20 C.F.R. § 404.1529(c)(3), and he structured her RFC accordingly. The ALJ noted, for example, that Plaintiff

> does not have any significant anatomical structural deformities and there is no evidence of ongoing nerve root compression which might be expected based on the degree of pain alleged. Further, [Plaintiff] has not required such aggressive measures for symptom relief as application of TENS equipment, or enrollment in a pain management program. The treatment regimen, therefore, indicates that [Plaintiff's] symptoms are not as intractable as alleged. These factors indicate that [Plaintiff's] allegations of functional restrictions are not fully credible.

> The undersigned finds that [Plaintiff's] description of the severity of the pain has been so extreme as to appear implausible. Her long-standing treating physicians

noted that [Plaintiff] has multiple positive Waddell signs[7] on examination including exaggeration and regionalization and she had significant symptom embellishment. Dr. Frank, [Plaintiff's] long standing treating physician, and Dr. Sanitate, a second opinion requested by [Plaintiff], opined that [Plaintiff] should go to work and they restricted [Plaintiff] to no lifting of greater than 40 pounds.

(Tr. at 11.) Plaintiff does not raise any specific challenge to this determination. Instead, her argument consists of nothing more than a challenge to the ALJ's application of <u>Craig</u>. Because this challenge fails for the reasons set out above, the Court finds that substantial evidence supports the ALJ's decision.

B.      Treating Physician Rule

Plaintiff next argues that the ALJ erred in assigning little weight to the opinion of Dr. Franc A. Barada. In particular, Plaintiff contends that the ALJ failed to properly apply 20 C.F.R. §§ 404.1527(c)(2) and 416.927(c)(2), better known as the "treating physician rule."[8] The treating physician rule generally requires an ALJ to give controlling weight to the opinion of a treating source as to the nature and severity of a claimant's impairment, based on the ability of treating sources to

provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) [which] may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

20 C.F.R. §§ 404.1527(c)(2) and 416.927(c)(2). However, the rule recognizes that the length of the treatment relationship and the nature and extent of each treatment relationship appreciably

---

[7] Waddell's signs are a group of physical tests and results that indicate a non-organic or psychological cause of chronic low back pain. <u>See</u> <u>Wall v. Astrue</u>, 561 F.3d 1048, 1056 & n.10 (10th Cir. 2009). Defendant notes that Waddell's signs are typically used to detect exaggeration or malingering.

[8] These provisions were previously codified at 20 C.F.R. §§ 404.1527(d) and 416.927(d).

tempers the weight an ALJ affords it. 20 C.F.R. §§ 404.1527(c)(2)(i), (ii) and 416.927(c)(2)(i), (ii).

As subsections (c)(2) through (c)(4) of the rule describe in great detail, a treating source's opinion, like all medical opinions, must be both well-supported by medical signs and laboratory findings and consistent with the other substantial evidence in the case record. 20 C.F.R. §§ 04.1527(c)(2)-(4) and 416.927(c)(2)-(4). "[I]f a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." Craig, 76 F.3d at 590; accord Mastro, 270 F.3d at 178. Where an ALJ declines to assign controlling weight to a medical opinion, he must "'explain in the decision the weight given' thereto and 'give good reasons in [his] . . . decision for the weight.'" Thompson v. Colvin, No. 1:09CV278, 2014 WL 185218 (M.D.N.C. Jan. 15, 2014) (quoting 20 C.F.R. § 404.1527(e)(ii); 416.927(e)(ii)). "This requires the ALJ to provide sufficient explanation for 'meaningful review' by the courts." Id. (quotations omitted).

In the present case, the ALJ clearly considered Dr. Barada's opinion that Plaintiff's fibromyalgia and osteoarthritis rendered her disabled, and the ALJ recounted this view in his decision. However, the ALJ further stated that "Dr. Barada completed [his] medical source statement after only seeing [Plaintiff] twice." The ALJ further noted that Dr. Barada's statement was not consistent with his own record of treatment or the other evidence of record. (Tr. at 11.) As Defendant correctly notes, it is unlikely that Dr. Barada even qualified as Plaintiff's treating physician at the time he issued his statement, given the brief duration of his treatment. See 20 CFR §§ 404.1502, 416.902. Moreover, even assuming he is considered a treating physician, Dr.

Barada's minimal familiarity with Plaintiff afforded the ALJ a substantial basis for according his opinions less weight.

Dr. Barada, a rheumatologist, completed the medical source statement in question on July 7, 2008, upon examining Plaintiff for only the second time. (Tr. at 353, 362-69.) Plaintiff's first appointment with Dr. Barada took place on May 30, 2008, approximately six weeks earlier. (Tr. at 354-55.) This brief treating relationship clearly fails to provide the kind of "detailed, longitudinal picture" and "unique perspective to the medical evidence" that the treating physician rule seeks to highlight. See 20 C.F.R. §§ 404.1527(c)(2) and 416.927(c)(2).

Moreover, Dr. Barada's treatment relationship with Plaintiff began nearly two years after her alleged onset date of July 21, 2006, and thus provides little, if any, insight into her limitations during the intervening time. Despite this failing, Dr. Barada posits in his medical source statement that Plaintiff's limitations have remained unchanged since July 2006. (Tr. at 369.) This assertion directly contradicts Dr. Barada's own treatment notes, which convey Plaintiff's self-reports of "wrist discomfort for one year" and elbow pain for only four months prior to her May 30, 2008 appointment. (Tr. at 354.)

Dr. Barada also opines in his medical source statement that Plaintiff's severe pain constantly interferes with her attention and concentration, that she is severely limited in her ability to deal with work stress, that she can sit only about 15 minutes before changing positions and can sit for a total of less than one hour in an 8-hour workday, that she must elevate both legs while sitting, that she can stand or walk about for only about 30 minutes continuously before having to lie down for more than three hours, and that she requires extra rest periods

totaling more than 6 hours in an 8-hour work day.  (Tr. at 364-66.)  He adds that Plaintiff can never lift or carry any amount of weight or do any handling or fingering, and that she can only occasionally reach with either hand.  (Tr. at 367-68.)

Dr. Barada's corresponding treatment notes, even those from the same day he issued his medical source statement, fail to support the stringent limitations he proposes.  Notably, he draws his opinion regarding Plaintiff's inability to sit or walk for any significant length of time directly from the "subjective" section of the treatment notes, meaning that they are based on nothing more than Plaintiff's self-reports.  (Tr. at 353.)  In fact, Dr. Barada necessarily relied on Plaintiff's subjective reports in formulating his entire medical source statement, given both the brevity of his treatment and the lack of any other support for his conclusions.  Even those findings in the "objective" section of his notes generally show that, aside from reduced range of motion in her neck and reduced grip strength and swelling in her hands, Plaintiff retained good range of motion in all other joints.  (Id.)  Nevertheless, Plaintiff reported significant pain and tenderness from manipulation of all joints, and her complaints of pain appear to provide the basis for Dr. Barada's opinion.  A factfinder need not accept such recitations of a claimant's subjective complaints, particularly where, as here, the ALJ specifically rejected Plaintiff's subjective complaints as incredible.  See, e.g., Johnson v. Barnhart, 434 F.3d 650, 657 (4th Cir. 2005); Craig, 76 F.3d at 590.

As the ALJ recounts over several pages in his decision, Dr. Barada's opinion also lacks consistency with the record as a whole.  (See Tr. at 8-11.)  Dr. Lawrence Frank, an orthopaedic surgeon, treated Plaintiff from August 21, 2006 through February 20, 2009, for back and neck

pain resulting from a work-related injury. (Tr. at 8, 9, 214.) Dr. Frank initially recommended that Plaintiff should remain temporarily out of work following her spinal injury on July 21, 2006. (Tr. at 220-23.) However, by January 29, 2007, Dr. Frank opined that Plaintiff could return to work with a lifting restriction of forty pounds and an allowance for position changes as needed. (Tr. at 198-99, 210-17.) Notably, Dr. Frank issued this recommendation despite his findings of weakness, tenderness, and pain upon examination. (Tr. at 214-15.) Although Dr. Frank did not feel that Plaintiff had reached maximum medical improvement as of January 2007 (Tr. at 215), he noted that MRIs revealed resolution of Plaintiff's spinal condition (Tr. at 210). Plaintiff continued to see Dr. Frank monthly between January and May of 2007, and his work recommendations remained unchanged. (See Tr. 198-217.) A second treating orthopaedist, Dr. Scott Sanitate, agreed that Plaintiff could return to work in January of 2007; in fact, he initially released Plaintiff with no restrictions and revised his opinion only upon Plaintiff's request. (See Tr. at 210, 214.)

Plaintiff saw yet another orthopaedic surgeon, Dr. David Musante, on June 5, 2007. He told Plaintiff that her complaints were "too diffuse," and that, like Dr. Frank, he saw "nothing on MRI report or plain x-rays to explain them." (Tr. at 195.) He encouraged Plaintiff to see a pain psychologist, but Plaintiff refused. (Id.) Dr. Musante also referred Plaintiff to Dr. Andrew Lynch for rehabilitation.

Dr. Lynch initially examined Plaintiff on July 16, 2007 and noted that she exhibited "some pain behaviors . . . in terms of exaggeration and regionalization" as well as "giveway weakness" in her upper extremities. (Tr. at 192.) However, Dr. Lynch also noted a "[p]otential

inflammatory arthritic process" in Plaintiff's hands (id.), which eventually led to her referral to

Dr. Barada for further evaluation (Tr. at 354.) When Plaintiff revisited Dr. Lynch in March and

April of 2008, he again noted "give away weakness" and "[s]ignificant symptom embellishment."

(Tr. at 346.) Upon Plaintiff's request that he fill out a disability form at that time, Dr. Lynch

initially refused, as he had "only seen her once in the past" and did not believe himself to be "a

good judge of most, if not all, of the questions asked." (Tr. at 351.) Dr. Lynch stated that,

despite Plaintiff's assertions that her "disability doctors" told her she was "totally disabled," he

"d[id] not believe that she [was] disabled[,] at least not from her back pain." (Id.)

In December 2007, two disability examiners further evaluated the scope of Plaintiff's

alleged impairments. On December 5, 2007, Dr. James Barber performed a consultative

examination on behalf of the North Carolina Department of Health and Human Services. (Tr.

at 185-190.) Dr. Barber opined that "[i]t would be difficult for [Plaintiff] to do a job that

required prolonged periods of lifting, walking, or standing" due to her low back pain. He also

found that her "bilateral hip pain further decreases her ability to do a job that requires prolonged

periods of standing or walking or lifting heavy objects." Finally, Dr. Barber posited that, due

to Plaintiff's bilateral wrist and finger pain, "it would be difficult for her to do a job that required

prolonged periods of rapid manipulation of small objects with her hands." (Tr. at 189.)

Later the same month, a second state agency physician, Dr. Robert Gardner, completed

a physical residual functional capacity form, assessing Plaintiff as able to lift up to 10 pounds

frequently and 20 pounds occasionally, and sit, stand, and/or walk for about six hours in an

eight-hour workday. (Tr. at 330.) In terms of postural restrictions, Dr. Gardner opined that

Plaintiff could frequently climb, balance, kneel, and crawl, but could only occasionally stoop and crouch. (Tr. at 331.) He assigned manipulative restrictions limiting Plaintiff to frequent, but not constant, reaching, handling, and fingering, and no constant overhead reaching. (Tr. at 332.) Notably, the ALJ declined to adopt Dr. Gardner's assessment in full because it failed to give sufficient consideration to Plaintiff's impairments and limitations and did not take subsequent medical evidence into account. (Tr. at 10.) Therefore, the ALJ further limited Plaintiff to only occasional climbing, balancing, kneeling, and crawling, as well as to lifting and carrying 10 pounds occasionally. (See Tr. at 7.)

Given the stark contrast between the extreme limitations posited in Dr. Barada's statement and those opined by Plaintiff's other clinicians, the inconsistency of Dr. Barada's medical source statement with the clinical evidence, including his own treatment notes, and the short duration of his relationship with Plaintiff upon issuing his medical source statement, substantial evidence clearly supports the ALJ's decision to accord Dr. Barada's statement little weight.

C.      RFC Assessment

In a related argument, Plaintiff contends that "the ALJ failed to include significant limitations in his RFC finding and in his hypothetical to the VE." (Pl.'s Br. at 12.) She identifies these limitations as follows: (1) a severe limitation in her ability to concentrate secondary to pain, (2) an inability to sit for more than 15 minutes at a time, (3) an inability to use her hands more than occasionally, and (4) the need for a sit/stand option. (Pl.'s Br. at 12-14.) Because Dr. Barada's opinion provides the only support for the first two limitations, these contentions fail

for the reasons set out in subsection B above. The remaining two contentions, although largely based on Dr. Barada's opinion as well, also find some support elsewhere in the record and warrant further discussion.

RFC measures the most a claimant can still do despite her physical and mental limitations. Hines, 453 F.3d at 562; 20 C.F.R. § 404.1545(a). An ALJ determines a claimant's RFC only after he considers all relevant evidence of a claimant's impairments, such as her ability to sit-stand, push-pull, lift weight, walk, etc., as well as any related symptoms, including pain. Hines, 453 F.3d at 562-63; 20 C.F.R. § 404.1545(b). The regulations, namely 20 C.F.R. § 404.1567, then translate the claimant's exertional abilities into an ability to perform a given level of work (i.e., sedentary, light, medium, heavy, or very heavy). Any non-exertional limitations, which encompass restrictions other than strength demands, may further restrict a claimant's ability to perform jobs within one of these exertional levels. See 20 C.F.R. § 404.1569a(c).

An ALJ need not discuss every piece of evidence in making his RFC determination. See, e.g., Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998); Diaz v. Chater, 55 F.3d 300, 307 (7th Cir. 1995). However, "he must build an accurate and logical bridge from the evidence to his conclusion." Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000). In the present case, Plaintiff first argues that the opinions of Dr. Barada and Dr. Barber "rule out" Plaintiff's ability to do frequent fingering as set out in her RFC assessment. Specifically, Dr. Barada opined that Plaintiff could never use her hands for repetitive fingering or handling tasks. (Tr. at 367-68.) Dr. Barber took a less limited view, finding that, "[b]ecause of [Plaintiff's] bilateral wrist and

finger pain[,] it would be difficult for her to do a job that required prolonged periods of rapid manipulation of small objects with her hands."  (Tr. at 189.)  Plaintiff contends that "the ALJ did not directly challenge, refute, or explain away" the opinions of Drs. Barber and Barada and "thus substituted his lay opinion for medical expertise" when he only precluded Plaintiff from using her hands constantly, rather than frequently.  (Pl.'s Br. at 13.)

Plaintiff's argument fails to mention the opinion of Dr. Gardner, who found that Plaintiff could perform frequent, but not constant, bilateral fingering and handling due to weakness and arthritic changes in her hands.  (Tr. at 332, 336.)  Significantly, Dr. Gardner determined that Plaintiff could sustain this level of activity despite noting record evidence that Plaintiff had difficulty holding anything firmly in her hands, including pens and utensils.  (Id.)  The ALJ drew his assessment of Plaintiff's manipulative abilities directly from Dr. Gardner's opinion, and he was entitled to do so, particularly in light of (1) the assignment of little weight to Dr. Barada's proposed limitations, and (2) the complete lack of any manipulative limitations in the opinions of Drs. Frank, Sanitate, and Lynch.  (See Tr. at 214-17, 351); 20 C.F.R. §§ 404.1527(c), (e) and 416.927(c), (e).  Substantial evidence thus supports the ALJ's decision.

Plaintiff next argues that the ALJ erred by failing to include a sit/stand option in his RFC assessment.  (Pl.'s Br. at 13-14.)  In particular, she questions the ALJ's failure to adopt the work restrictions set out by Drs. Frank and Sanitate, who suggested that Plaintiff be allowed to change position "as necessary."  (See Tr. at 214.)  However, as Defendant correctly notes, Dr. Sanitate initially released Plaintiff with no restrictions whatsoever; only after Plaintiff returned to his office specifically to request further restrictions did Dr. Sanitate add a lifting restriction of 40

pounds and an allowance for position change. (Id.) Dr. Frank merely adopted Dr. Sanitate's restrictions. (Tr. at 215.) Dr. Barada's opinion that Plaintiff can only sit for about 15 minutes before needing to stand or walk about provides the only other support in the record for a sit/stand option,[9] and it merits little weight for the reasons set out above. (Tr. at 364.) In short, all evidence supporting a need for position change is premised upon Plaintiff's own reports and requests, and, as such, deserves no deference, particularly in light of the negative credibility finding in the present case. Accordingly, the ALJ built "an accurate and logical bridge" connecting the substantial evidence in this case with his RFC assessment. The Court finds no error.

IT IS THEREFORE RECOMMENDED that the Commissioner's decision finding no disability be AFFIRMED, that Plaintiff's Motion for Judgment on the Pleadings [Doc. #14] be DENIED, that Defendant's Motion for Judgment on the Pleadings [Doc. #17] be GRANTED, and that this action be DISMISSED with prejudice.

This, the 4th day of February, 2013.


_____/s/ Joi Elizabeth Peake_____

United States Magistrate Judge

---

[9] Dr. Barber opined that (1) Plaintiff was moderately limited in her ability to sit and that (2) "[i]t would be difficult for her to do a job that required prolonged periods of lifting, walking, or standing." (Tr. at 188-89.) However, he posited nothing with regard to the frequency of position change these limitations would require.